UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DIANE LIFSHEN, as executor of the estate of Jay Lifshen, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. 3:18-CV-03310-X |
| 20/20 ACCOUNTING SOLUTIONS, LLC, | § § § § | |
| *Defendant.* | § § | |

# MEMORANDUM OPINION AND ORDER

This case involves an accounting firm voluntarily paying personal life insurance premiums for the physicians belonging to the practice the accounting firm served. The firm missed one such payment, the policy lapsed, and the physician died. The physician's estate sued the accounting firm. The accounting firm [Doc. No. 38] and the estate [Doc. No. 41] both moved for summary judgment. And the accounting firm moved to strike the estate's motion for summary judgment. [Doc. No. 45].

For the foregoing reasons, the Court **DENIES** the firm's motion to strike the estate's untimely motion for summary judgment. Regarding the dueling summary judgment motions, the Court holds there is no evidence of a contract Jay Lifshen may enforce against the firm, there was no common-law duty of the firm to pay Lifshen's personal life insurance premiums, the estate has brought forth no evidence that the physician would have paid the premiums or otherwise obtained insurance on his own,

1

and Lifshen was more than 50% responsible for the lapse in the policy because he knew or should have known of the missed payment during the grace period. As a result, the Court **DENIES** the estate's motion for summary judgment, **GRANTS** the firm's motion for summary judgment, and **DISMISSES** the case **WITH PREJUDICE**.

## I. Factual Background

Jay Lifshen was a podiatrist affiliated with Podiatric Medical Partners of Texas, P.A. ("Podiatric Partners"). 20/20 Accounting Solutions, LLC (the firm) had a business services agreement with Podiatric Partners for accounting and bookkeeping services. The firm agreed "to provide management, administrative and/or business services that are necessary and appropriate assistance for the day-to-day administration of the non-medical aspects of [the] medical practice." [1] As to insurance, the agreement specified that the firm

> will assist [Podiatric Partners] in establishing a relationship with an insurance broker and assess appropriate amounts and types of insurance for [Podiatric Partners] to obtain as set out in the Exhibit A. The ultimate oversight and supervision of all liability related to [Podiatric Partners] is and shall remain the sole responsibility of [Podiatric Partners]. The costs and expense incurred by [the firm] in rendering the services to [Podiatric Partners] in this Section shall be [firm] Expenses, but the costs incurred under any contract related to insurance for the operation of [Podiatric Partners] shall be [Podiatric Partners] Expenses.[2]

The agreement also contained a requirement of the practice:

> Insurance. [Podiatric Partners] shall obtain and maintain with commercial carriers mutually acceptable to [the firm] and [Podiatric Partners] appropriate workers compensation, professional malpractice covering [Podiatric Partners] and each Physician (with minimum coverage amounts of at least $100,000 per occurrence and $300,000

---

[1] Doc. No. 40 at 6.

[2] Doc. No. 40 at 6.

aggregate) and comprehensive commercial general liability insurance covering [Podiatric Partners] and each Podiatrist and all other health care personnel.  Each such insurance policy shall name the [firm] as an additional insured and by its terms provide that it shall not be amended or modified without the prior written consent of [the firm] and shall not be canceled or terminated unless 10 days prior notice thereof is given by the insurer to the [firm].  The cost of such insurance shall be a [Podiatric Partners] Expense.[3]

The agreement's only reference to life insurance was in Exhibit A, which specified that the firm would provide the following human resource management services: "Negotiate preferred pricing for employee benefits packages, ie. Medical, Denial Vision, 401K, Life Insurance."[4]  Finally, the agreement also provided that,

upon the request of [Podiatric Partners] and agreement by [the firm], the [firm] may perform additional services for such additional compensation to be mutually agreed upon in writing by [Podiatric Partners] and the [firm] (which writing shall be deemed to be an addendum to this Agreement and incorporated herein for all purposes).[5]

Lishen had two personal life insurance policies.  In late July or early August 2016, Lifshen emailed firm employee Jessi Sandheinrich regarding the annual premium for his personal life insurance policy ending in 1442, which the firm paid with a check for $3,105.50 on August 3.  He sent a second email to Sandheinrich on August 23, 2016 about his separate policy ending in 1750 with an annual premium of $3,765 and coverage of $1 million.  That email contained a letter from the insurer stating the premium on policy 1750 was due August 4 and the grace period would expire September 9.  Sandheinrich indicated the premium had been paid, apparently referring to policy 1442 and not recognizing the existence of a separate, lapsing policy

---

[3] Doc. No. 43 at 12.

[4] Doc. No. 43 at 23.

[5] Doc. No. 40 at 6.

1750. Lifshen received a notice on September 16 of a lapse in coverage dated September 9 and inquired again of Sandheinrich.

Lifshen emailed Sandheinrich again on September 27, inquiring on the status and expressing concern that his struggle with lymphoma in 2012 might preclude reinstatement of the policy. Sandheinrich responded that she found the messages Lifshen referenced, apologized for missing the invoice on the 1750 policy, and advised she would call the insurer. Later that day, Sandheinrich informed Lifshen the insurer required him to complete and submit a reinstatement form. Ultimately, the insurer declined to reinstate the policy, and Lifshen passed away on September 11, 2018.

Diane Lifshen, as executor of Dr. Lifshen's estate, brought claims of breach of contract and negligence against the accounting firm. The firm and the estate both moved for summary judgment, and the firm moved to strike the estate's belated summary judgment motion.

## II. Legal Standard

Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] "A fact is material if it 'might affect the outcome of the suit'" and "[a] factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[7] Courts "resolve[s] factual controversies in favor of the

---

[6] FED. R. CIV. P. 56(a).

[7] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (alteration in original) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[8] Thus, "the nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."[9]

But this is no ordinary case where a fact dispute will send the case to a jury trial. Neither the estate nor the firm requested a jury trial on the contract and negligence claims in this case. As such, this Court will be the trier of fact. Rule 56 makes no distinction at summary judgment for bench trials or jury trials. If further factual development is warranted or credibility of witnesses is an issue, the court will deny summary judgment on the negligent undertaking theory of the estate's negligence claim and proceed to a bench trial. As the (old) Fifth Circuit has framed this rare occurrence:

> If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved. Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably, or, as is the case here, that delay under the circumstances proved is justified or unjustified, even if that conclusion is deemed "factual" or involves a "mixed question of fact and law." A trial on the merits would reveal no additional data. Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.[10]

---

[8] *Antoine v. First Student, Inc.,* 713 F.3d 824, 830 (5th Cir. 2013).

[9] *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).

[10] *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978).

III.  Application

    A.    The Motion to Strike the Estate's Motion for Summary Judgment

Before considering the estate's motion for summary judgment, the Court must address the firm's motion to strike it. The firm argues that the scheduling order set the dispositive motion deadline as Saturday, February 29, but the estate filed its motion for summary judgment on Monday, March 2. The firm also contends that Federal Rule of Civil Procedure 6 (which allows weekend deadlines to roll to the following business day) doesn't apply to fixed deadlines in court orders. The estate responded that its delay was inadvertent and there was no prejudice to the firm.

The Court concludes that the estate's inadvertent mistake is excusable and did not prejudice the firm. The estate's arguments and citations to legal authority are cases involving striking pleadings and default judgments. That is not the concern here. If the Court were to strike the estate's motion for summary judgment, it would not strike its complaint or its response to the firm's motion for summary judgment. However, the Court views the error as excusable neglect that did not prejudice the firm's ability to respond to the motion. Accordingly, the Court denies the motion to strike, construes the response to the motion as a motion for leave for an extension to file the motion for summary judgment late, and grants the motion for leave. The Court will thus consider the estate's motion for summary judgment.

    B.    The Firm and the Estate Motions for Summary Judgment

The arguments in the dueling summary judgment motions largely overlap. Thus, the Court will consider the arguments together, bearing in mind the legal standard for summary judgment. The firm's motion for summary judgment argues:

6

(1) there is no contractual relationship assigning a duty to the firm to pay Lifshen's personal insurance policies; (2) the firm owed Lifshen no duty, so the negligence claim fails; and (3) the claims for mental anguish, emotional distress, and pain and suffering fail as a matter of law.  The estate responds that its amended complaint "contains sufficient factual allegations that would support a determination that her breach of contract claim is meritorious;" (2) the business services agreement also covered services to individuals and working with insurers on remitting insurance payments; (3) the pattern and practice of the firm was to pay premiums for Lifshen's life insurance policies, giving rise to at least an implied contract; and (4) the estate raised evidence of duty, breach, and damages sufficient to have the negligence claim survive a motion to dismiss.

The estate's motion for summary judgment argues that the estate has proven every element of the breach and negligence claims, and that the firm has no meritorious defense.  The firm responds that: (1) the estate executor and Lifshen are not parties to the business services agreement and cannot rely on it; (2) communications taken after the operative events don't retroactively create a contract; (3) the firm owed Lifshen no legal duty, which forecloses the negligence claim; and (4) the estate isn't entitled to summary judgment on claims for mental anguish, emotional distress, pain and suffering, or attorney's fees.

The Court will first assess the firm's assertions that (1) there is no contractual relationship Diane Lifshen may sue for, and (2) there is no common-law duty.  These are questions of law for the Court, and if the firm is right, then the estate necessarily cannot prevail on summary judgment on the contract or negligence claims or damages

7

associated with those claims.

1. Contract

One of the estate's two freestanding claims is for breach of contract. The firm contends there is no contractual relationship requiring the firm to pay Lifshen's personal insurance policy premiums that the estate may sue for. A breach of contract claim requires proof of a valid contract that the plaintiff performed and the defendant breached.[11] Here, the written contract on the record is between the firm and Podiatric Partners. An Exhibit indicates that the firm must "[n]egotiate preferred pricing for employee benefits packages, ie. Medical, Denial Vision, 401K, Life Insurance."[12] This obligation to negotiate pricing for employee benefits is not necessarily an obligation for the firm to pay for those benefits. But assuming for the sake of argument that it is an obligation on the firm to pay, the contract is between the firm and Podiatric Partners, not the firm and Lifshen. Moreover the estate has raised any third-party beneficiary theory that would extend any contractual obligations to parties other than the firm and Podiatric Partners.

The estate responds that (1) the contract included individuals, covered paying bills and practice expenses, and referred to the firm negotiating pricing for life insurance for employees, and (2) the conduct of the firm admitted the existence of a contract. But the contract reference to individuals is simply a definition of the physicians in the practice—it is not an agreement between the individuals and the

---

[11] *Smith Int'l., Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

[12] Doc. No. 43 at 23.

firm.[13]

The only argument remaining is whether the conduct of the firm admitted to the existence of an implied contract with Lifshen. Two problems foreclose this argument. First, all contracts (express and implied) require mutual obligations.[14] If an implied contract exists apart from the business services agreement, then there must be some consideration flowing from Lifshen to the firm. The firm filed an affidavit from its president indicating there was no such consideration flowing from Lifshen to the firm to compensate it for paying his personal life insurance premiums. In response to this argument, the estate offered no evidence of consideration Lifshen gave to the firm.

In addition, the statute of frauds requires any agreement where one party (like the firm) is responsible for the debt of another (like Lifshen) to be in writing.[15] And there is no evidence in this record of a written agreement between Lifshen and the firm requiring the firm to pay Lifshen's life insurance policies. In short, the only enforceable contract in this case can only be enforced by the firm or Podiatric Partners. Accordingly, the firm is entitled to summary judgment on the estate's breach of contract claim.

---

[13] Compare Doc. No. 43 at 6 ("The term 'Practice' means Podiatric Medical Partners of Texas, P.A., a Texas professional association, and any successors or permitted assigns.") *with* Doc. No. 43 at 7 ("The term 'Physician' or 'Podiatrist' means each individually licensed Podiatrist who is employed or otherwise retained by or associated with Practice."). The contract is between the firm and Podiatric Partners. Doc. No. 43 at 4 (stating that the agreement is "between 20/20 Accounting Solutions, LLC . . . Podiatric Medical Partners of Texas, P.A.").

[14] *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) ("A promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance. When illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation, and therefore, no contract." (citations omitted)).

[15] TEX. BUS. & COMM. CODE § 26.01 (requiring a written agreement for "a promise by one person to answer for the debt, default, or miscarriage of another person").

2. Negligence

Next the Court considers the negligence claim and the firm's argument that the firm owed no duty to Lifshen. Negligence claims require proof of a legal duty the defendant owed to the plaintiff, breach of that duty, and damages the breach proximately caused.[16] Whether a legal duty exists is a question of law for the Court.[17] The estate makes a cursory response that there is a duty, but also raises the prospect of section 324A of the Second Restatement of Torts, which imposes a duty of reasonable care on one who undertakes to render services for another. The Court understands the estate's negligence claim as supporting both a general negligence theory and a negligent undertaking theory. As such, the Court must assess both theories to decide whether either party is entitled to summary judgment.

In doing so, the Court must be mindful of the framework it operates within. The estate is asking the Court to impose a tort duty under Texas law in this diversity case. As the Fifth Circuit has admonished:

> In a diversity case like this one, when no Texas Supreme Court case precisely resolves the legal issue, we must make an *Erie* guess and determine as best we can what the Supreme Court of Texas would decide. This requires us to use the sources of law that the state's highest court would look to, including intermediate state appellate court decisions, the general rule on the issue, decisions from other jurisdictions, and general policy concerns. Ultimately, however, it is not for us to adopt innovative theories of recovery under state law without strong reason to believe that those theories would be adopted if the Texas Supreme Court had the opportunity.[18]

a. General Negligence

---

[16] *Tomdra Invs., L.L.C. v. CoStar Realty Info., Inc.*, 735 F. Supp. 2d 528, 533 (N.D. Tex. 2010).

[17] *Tri v. J.T.T.*, 162 S.W.3d 552, 563 (Tex. 2005).

[18] *Martinez v. Walgreen Co.*, 935 F.3d 396, 398–99 (5th Cir. 2019).

Negligence claims require proof of a legal duty the defendant owed to the plaintiff, breach of that duty, and damages the breach proximately caused.[19] Whether a legal duty exists is a question of law for the Court.[20] The Fifth Circuit has recently described "the factors the Texas Supreme Court would consider" as "the foreseeability of the harm, the presence of other protections, and the danger of interference with the legislature's balancing of public policies."[21]

The first element is foreseeability. The closest Texas authority the Court has found is from the Austin Court of Appeals in *Barnes v. University Federal Credit Union & Government Employees Insurance Co./GEICO Insurance*.[22] The court there observed that, "[a]s for the negligence claims against GEICO, the summary-judgment evidence, specifically the insurance policy documents clearly noting the absence of collision and comprehensive insurance, negates the element of foreseeability as a matter of law."[23] The court further expounded that "[t]he law presumes that a party to a contract has read and understood the contract" and that "it would not have been reasonably foreseeable that based on a statement that she had 'full coverage,' Barnes would ignore her insurance policy statements indicating that she did not have collision and comprehensive coverage, and that she would then suffer damages in the form of retroactive collateral insurance premiums."[24]

---

[19] *Tomdra Invs., L.L.C. v. CoStar Realty Info., Inc.*, 735 F. Supp. 2d 528, 533 (N.D. Tex. 2010).

[20] *Tri v. J.T.T.*, 162 S.W.3d 552, 563 (Tex. 2005).

[21] *Martinez*, 935 F.3d at 404.

[22] No. 03-09-00003-CV, 2010 WL 2133946 (Tex. App.—Austin May 27, 2010, no pet.) (mem. op.).

[23] *Id.* at *7.

[24] *Id.* (citation omitted).

Likewise, here the question is whether a person of ordinary intelligence would have anticipated the damage the negligent act created. As with *Barnes*, such a case becomes all the more clear when there is a contract. Here, the contract was between the physician's association Lifshen worked for and the firm. As addressed above, that contract obligated the firm to introduce the physicians to insurers and to negotiate pricing for such employee benefits as life insurance. There is no evidence that contract obligated the firm to pay for any particular personal life insurance premiums. A person of ordinary intelligence would not have anticipated that a payment of premiums would fundamentally alter a contract that indicated it could only be altered by a signed writing, and the estate raised no argument that the premium payments made those in Lifshen's position a party to the contract.[25] The Court does not believe this is reasonably foreseeable, just as it was not reasonably foreseeable in *Barnes* for the insured to rely on a misrepresentation rather than the language of the policy.[26]

The second inquiry on duty is the presence of other protections. The contractual relationship between the firm and Pediatric Partners did not require the firm to pay premiums for particular personal life insurance policies of the physicians. This left the remaining protection with Lifshen to either pay his own premiums after obtaining insurance, or closely supervise the firm when the firm undertook such a task. Lifshen could closely monitor the firm's payment or nonpayment by contacting

---

[25] This is all the more true when policies have grace periods after missed payments and there is the potential for reinstatement.

[26] *Id.*

12

the insurer, who sent him invoices directly, in addition to contacting the firm, to whom Lifshen would send the invoices. And there was the added protection that the insurer notified Lifshen when he missed a premium payment, allowing him to make the payment during the grace period if he so chose. Thus, other protections existed apart from the law imposing a duty on the firm to pay Lifshen's personal life insurance premiums.

The third aspect of the duty inquiry is "the danger of interference with the legislature's balancing of public policies."[27] This formulation by the Fifth Circuit and Texas Supreme Court acknowledges the rightful place of the people's representatives in the Legislature to make public policy decisions for the state, and that courts are not too lightly intrude on this constitutional role. The Texas Legislature heavily regulates insurance. Insurance has its own dedicated code[28]—not to mention insurance is the only codified subject under Texas law that still has additional civil statutes that have not been codified but are also still in effect. The codified Insurance Code has 1,082 references to life insurance. The Legislature's regulation of life insurance is so pervasive that it specifies, for example, that term life insurance policies may be reinstated after a lapse in premium payments only upon proof of mental capacity of the insured (*i.e.*, that the insured did not understand the consequences of a failure to pay premiums when due).[29] The Texas Legislature could have passed a law requiring entities that make life insurance premium payments on

---

[27] *Martinez*, 935 F.3d at 404.

[28] *See generally* TEX. INS. CODE.

[29] TEX. INS. CODE §§ 1106.002–.003.

behalf of another, with whom they do not have privity of contract, to timely make those payments. It did not. Such an order from this Court would intrude into the Legislature's prerogative.

In short, the foreseeability factor, Lifshen's ability to protect himself during the grace period, and the Fifth Circuit and Texas Supreme Court's warning of encroachment on the Legislature's prerogative make this Court hold that the firm had no duty at law to gratuitously and timely pay Lifhen's personal life insurance premiums. Accordingly, the Court grants the firm's motion for summary judgment and denies the estate's motion for summary judgment as to the general negligence theory of the estate's negligence claim.

### b. Negligent Undertaking

But that is not the end of the matter. Texas law still recognizes a duty of reasonable care when undertaking rendering services to another. This doctrine is more specific and more applicable to the facts at hand. The Restatement formulates the doctrine in section 323 as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.[30]

And the Restatement frames a corollary for third parties in section 324A as

---

[30] Restatement (Second) of Torts § 323 (1965).

14

follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[31]

The Texas Supreme Court has discussed Sections 323 and 324A before but never expressly adopted them.[32] Instead, the Texas Supreme Court adopted a common law cause of action for negligent undertaking as follows: "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby. This proposition has long been recognized by the courts of this State."[33] And more recently, the Texas Supreme Court framed the rule and cited both Restatement sections: "While Texas law imposes no general duty to 'become [a] good Samaritan,' we have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation."[34]

---

[31] Restatement (Second) of Torts § 324A (1965).

[32] *Tex. Farm Bureau Ins. Companies v. Sears*, 54 S.W.3d 361, 368 (Tex. App. 2001), *rev'd on other grounds*, 84 S.W.3d 604 (Tex. 2002) ("[W]e do not find that the Texas Supreme Court has ever expressly adopted section 323 . . . ."). The Waco Court of Appeals acknowledged that the Texas Supreme Court recognized a claim for "'negligent undertaking' as expressed in *Colonial Sav. Ass'n* and *Otis Engineering Corp*[.]" *Id.*

[33] *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976).

[34] *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837–38 (Tex. 2000) (citing *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991); *Sav. Ass'n v. Taylor*, 544 S.W.2d at 120

Regarding the elements for such a claim, the Texas Supreme Court indicated the undertaker would only be negligent if:

> (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm.[35]

These elements are ordinarily not questions of law for the Court to decide, but they are here because the Court is the trier of fact.[36] So here we are, with both sides moving for summary judgment in a bench trial case on a negligent undertaking theory with three elements.

The third element (either the plaintiff relied on the defendant's undertaking or the undertaking increased the risk of harm to the plaintiff) is the element the estate has no evidence of at summary judgment. Here, the estate must have evidence that either (a) Lifshen relied on the firm's performance or (b) the firm's failure to pay increased Lifshen's risk of harm.[37] The Texas Supreme Court's analysis from *Colonial Savings* indicates how to navigate this fork in the road in the insurance context. There, the bank (Colonial Savings) that held the mortgage on a property obtained property insurance but inadvertently covered only one of the two homes on the property.[38] A fire destroyed the home the policy did not cover, and the owner sued

---

(Tex. 1976); Restatement (Second) of Torts §§ 323, 324A (1965)).

[35] *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013) (citing *Torrington*, 46 S.W.3d at 838 and RESTATEMENT (SECOND) OF TORTS § 324A).

[36] *Nunez*, 572 F.2d at 1123–24.

[37] *Nall*, 404 S.W.3d at 555–56.

[38] *Colonial Sav.*, 544 S.W.2d at 118.

the bank for negligent undertaking.[39]  The owner (Taylor) argued that the failure to insure increased his risk of harm, but the Court disagreed.[40]  The Court observed that:

> Colonial's failure to obtain insurance on the house did not increase the risk of fire to the house.  If Taylor did not intend to insure the house against loss by fire in any case, then Colonial's failure to provide insurance would have left Taylor in no worse condition than if Colonial had never undertaken to provide insurance in the first place.  Had Taylor never learned of Colonial's undertaking to provide insurance, he certainly could not be heard to say that Colonial should be liable for failing to do so, because the loss would be as much a result of his own failure to obtain insurance as of Colonial's.  We hold, therefore, that Colonial cannot be liable for Taylor's loss unless Taylor forbore from obtaining his own insurance in reliance upon Colonial's undertaking to obtain it for him.[41]

The Court did not find a lack of insurance to be the risk that negligent undertaking claims are concerned with.  Rather, the risk is the harm itself (not insurance coverage of the harm).  Applying those principles here, there is no record evidence that Lifshen's risk of death was greater as a result of being covered by some life insurance but not by policy 1750.[42]

To have the negligent undertaking theory survive summary judgment then, the estate must have evidence that Lifshen "forbore from obtaining his own insurance in reliance upon [the firm's] undertaking to obtain it for him."[43]  The only attempt it

---

[39] *Id.*

[40] *Id.*

[41] *Id.* at 120.

[42] Even if one were to make a novel, though not persuasive, argument that the risk in question is dying without leaving an estate and not death itself, any increase to the risk that the firm may have caused was negated by the timeliness of their responses, and the amount of time that Lifshen had but failed to use to ensure that his million dollar insurance policy would not be cancelled due to a lack of diligence on his part..

[43] *Id.*

made at this third prong of the test was a recitation of the elements of the claim instead of a marshaling of evidence. The sum total of the estate's factual third prong argument is: "In this case, Defendant undertook to render services for Plaintiff, its failure to exercise reasonable care increased the risk of harm (cancellation of the Policy) and Plaintiff was ultimately significantly damaged due to reliance upon Defendant."[44] There is no citation to evidence to support the reliance argument. Perhaps this is because the estate failed to engage in meaningful discovery.[45] So while judges are not pigs hunting for truffles in a summary judgment record, there is also nothing here to hunt.[46] The Court was given no evidence to indicate that Lifshen would have, had he exercised due diligence, paid the premium on his own. And in any event, such lack of action was unreasonable under the circumstances.

There is an independent and additional reason why the Court believes summary judgment is appropriate for the firm on the negligent undertaking theory: Lifshen's proportionate responsibility. The Texas proportionate responsibility statute provides that "a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."[47] If the plaintiff is less than 50%

---

[44] Doc. No. 49 at 8. As addressed above, the Texas Supreme Court made clear from its holding in *Colonial Savings* that the lack of insurance is not the increased risk of harm a negligent undertaking claim protects against. So cancellation of the policy cannot be Lifshen's actionable increased risk of harm. It must be reliance.

[45] Doc. No. 55 at 3 ("[The firm] provided communications and documents with its initial disclosures. Following that, Lifshen did not serve interrogatories, requests for production, requests for admission, or deposition notices. Lifshen did not file a motion pursuant to FED. R. CIV. P. 56(d) specifying the reason for the absence of facts necessary to oppose [the firm]'s motion.").

[46] *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) (quotation marks omitted) (alteration in original) ("Judges are not like pigs, hunting for truffles buried in [the record].").

[47] TEX. CIV. PRAC. & REM. CODE § 33.001. Chapter 33 applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought[.]" *Id.* § 33.002(a)(1).

responsible, her recovery is reduced by her percentage fault.[48]

The firm has raised the argument that Lifshen could have avoided the lapse in the policy. Specifically, the firm argues and points to record evidence that during the grace period, Lifshen learned that the firm believed the premium check cleared the bank on August 3, but he received a letter dated August 5 from the insurer stating he missed the payment. The Court agrees. Based on the summary judgment record from the estate and the firm, Lifshen either knew or should have known that a letter regarding policy 1750 two days after the firm said his premium check cleared indicated the check was for his other policy. This letter was sent to him during the grace period, which enabled him to pay his personal life insurance premium and keep the policy in effect. The Court, as fact finder in this proceeding, holds on this record that Lifshen was more than 50% responsible for the lapse in the policy. As a result, the Texas Proportionate Responsibility statute forecloses his claim.[49]

## IV. Conclusion

For the foregoing reasons, the Court denies the firm's motion to strike the estate's untimely motion for summary judgment. Additionally, the Court concludes there is no contract enforceable by Lifshen for the firm to pay his personal life insurance premiums, there is no common law duty of the firm to pay Lifshen's premiums, any reliance on the firm to pay the premiums was unreasonable, and

---

[48] *Id.* § 33.012(a) ("If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.").

[49] Both the firm and the estate make various arguments on the viability of claims for mental anguish, emotional distress, pain and suffering, and attorney's fees. But those claims are not freestanding causes of action; they are simply damages associated with different claims the Court has determined are not viable at summary judgment.

Lifshen was more than 50% responsible for the lapse in the policy because he knew or should have known of the missed payment during the grace period. As a result, the Court **DENIES** the estate's motion for summary judgment and **GRANTS** the firm's motion for summary judgment, and the case is **DISMISSED WITH PREJUDICE**.

    **IT IS SO ORDERED** this 30th day of April.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE